UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

----oo0oo----

CALIFORNIANS FOR ALTERNATIVES
TO TOXICS, a non-profit
corporation; WILDERNESS WATCH,
a non-profit corporation,
LAUREL AMES, an individual and
ANN MCCAMPBELL, an individual,

     NO. CIV. S-05-1633 FCD KJM

     Plaintiffs,

    v.               MEMORANDUM AND ORDER

JACK TROYER, in his official
capacity; USDA FOREST SERVICE;
GARY SCHIFF, in his official
capacity,

     Defendants.

----oo0oo----

    This matter is before the court on plaintiffs' motion for a
preliminary injunction enjoining defendants "from allowing to be
conducted or conducting any component of the Silver King Creek
Paiute Cutthroat Trout ["PCT"] Recovery Project [the "Project"],[1]

---

    [1]    The goal of the Project is to rid the waters, some 11
miles of creek and a nearby lake, of non-native rainbow trout,
which have interbred with PCT and compete with it for food.  Once
the rainbow trout are eliminated, part of the area would be
restocked with genetically pure PCT.

1

including specifically any application of rotenone formulations and potassium permanganate to Silver King Creek, its tributaries and backwaters, and Tamarack Lake, in the Carson-Iceberg Wilderness in California." ([Proposed] Order Granting Pls.' P.I. Mot., filed Aug. 26, 2005.)[2]  The court heard oral argument on the motion on August 30, 2005 and announced from the bench its decision to grant the motion.  By this order, the court memorializes its reasons for the decision, previously stated on the record at the hearing.[3]

To obtain a preliminary injunction, a party must show either: "(1) a combination of probable success on the merits and the possibility of irreparable injury, or (2) that serious questions are raised and the balance of hardships tips sharply in [its favor]."  Stuhlbarg Int'l Sales Co. v. John D. Brush & Co., Inc., 240 F.3d 832, 839-40 (9th Cir. 2001).  "These two formulations represent two points on a sliding scale in which the required degree of irreparable harm increases as the probability of success decreases."  Roe v. Anderson, 134 F.3d 1400, 1402 (9th Cir. 1998).  Under either formulation of the test, a plaintiff must still demonstrate a significant threat of irreparable injury.  Oakland Tribune, Inc. v. Chronicle Publishing Co., 762 F.2d 1374, 1376 (9th Cir. 1985).

---

[2]    The court previously granted plaintiffs, on August 23, a temporary restraining order on the same terms.  The matter was set for a preliminary injunction hearing on an expedited schedule in light of time constraints and logistical issues regarding implementation of the Project.

[3]    The underlying facts of this case are exhaustively discussed by the parties in their briefs, and they accordingly are not discussed herein.

1    Here, plaintiffs made a strong showing of irreparable harm

2  if the Project is not enjoined and that the balance of interests

3  tips decisively in their favor.  As such, to prevail on the

4  motion, plaintiffs were only required to raise "serious

5  questions" as to the merits of their NEPA claims (namely, that

6  the United States Department of Agriculture Forest Service (the

7  "Service") violated NEPA in failing to prepare an Environmental

8  Impact Statement ("EIS") and/or that the service's Environmental

9  Assessment ("EA") was inadequate), which the court found they

10  did.  The court will address in turn below the bases for each of

11  these findings.

12    **1.   <u>Irreparable Harm</u>**

13    There is no dispute that poisoning the waters with rotenone,

14  a highly toxic chemical lethal to acquatic organisms that obtain

15  oxygen from water, will kill macroinvertebrates and certain

16  species may never return to the impacted area.  (Erman Decl., ¶s

17  3, 29.)  While the parties dispute the relative ability of

18  macroinvertebrates to repopulate,[4] the lethal consequences are

19  certain.

20    Additionally, plaintiffs present evidence that the poisoning

21  may harm certain "rare and endemic" macroinvertebrates present in

22  the area.  According to plaintiffs' macroinvertebrate expert,

23

24    [4]   According to plaintiffs' experts data from past
projects in other reaches of Silver King Creek show that even
25  years after the poisoning, entire taxa were still missing from
the stream (on average, between 30 to 40% of all
26  macroinvertebrate taxa were still missing three years after the
project).  (Erman Decl., ¶s 13-15, 24-28, 31.)  To the contrary,
27  defendants' experts maintain the macroinvertebrate populations
will recover quickly and to an "excellent" level as they have in
28  past, similar projects.  (Moyle Decl., ¶s 10-16; Behke Decl., ¶s
11-15.)

3

Nancy Erman, it is "highly probable" that such species exist in
the area.  While defendants' experts dispute this conclusion,
there has not been any studies to confirm either parties'
position.  Nevertheless, equity favors plaintiffs because once
the poisoning takes place, the eradication of such species, if
present, is, again, swift and certain.

Finally, it is undisputed that the subject area is an
unimpaired reference in that it has never been previously
poisoned.  Were the court to allow the poisoning to proceed
immediately, that reference would be permanently eliminated.  In
that regard, as in others, the execution of the Project means the
stark finality to life in an eleven mile stream in the treasured
Sierra Nevada Mountains.

For these reasons, plaintiffs have demonstrated a strong
likelihood of irreparable harm if the court does not  enjoin the
Project.

### 2.   **Balancing of Interests**

In plaintiffs' favor is evidence that macro-invertebrates,
and possibly rare and endemic macroinvertebrates, will be killed
by the poisoning and may never repopulate; additionally, the
poisoning will eliminate the unimpaired reference.  In
defendants' favor, the PCT is a listed "threatened species" under
the Endangered Species Act.  According to the Service, in the
absence of immediate implementation of the Project, the long term
survival of the PCT will be in some doubt. (Somer Decl., ¶ 6,
12.)

1    However, the PCT Recovery Plan itself explicitly finds that

2    the PCT has only a "moderate degree of threat."[5]   (Ex. FF at

3    iii.)   Likewise, defendants did not produce any convincing

4    evidence that absent implementation of the Project this year or

5    even in the next few years, the PCT would be at risk of

6    extinction.   Rather, there is undisputed evidence that the pure

7    strain of PCT has existed in the Silver King Creek above

8    Llewellyn Falls for at least 11 years without any negative

9    impacts, thus providing additional protection for the survival of

10   the species.[6]   Also, significantly, defendants did not argue in

11   their joint petition to the California State Water Board that

12   there was any urgency to act in 2005.[7]

13   Defendants' reliance on the possibility of some catastrophic

14   event, such as a forest fire or flood, which could destroy the

15   existing PCT in its present habitats is unconvincing.   Such

16

17        [5]   Defendants are incorrect that the Recovery Plan stated
18   that the PCT is "highly vulnerable" to extinction.   Rather, the
     Plan stated that the PCT *would be* "highly vulnerable" *if* the
     pure, self-sustaining runs of PCT did not already exist in at
19   least six other creek watersheds (*which it does).*

20        [6]   From the EA, it also appears that PCT currently exists
     in the Corral Valley Creek and Coyote Valley Creek within the
21   Silver King Creek Basin, and plaintiffs assert in waters outside
     the Basin.

22        [7]   Indeed, it is worth noting that defendants have made in
23   a series of choices which have delayed implementation of the
     Project.   First, they choose in 2002 to not conduct a full NEPA
24   analysis; that decision resulted in litigation against the
     Service; ultimately, the Service settled the suit, promising to
25   perform the requisite analysis.   However, two years passed until
     completion of the EA at issue here.   Upon seeking the necessary
26   permits from state agencies, defendants again further delayed the
     matter; rather than provide information in response to the
27   Lahonton Regional Board's inquiries, defendants cancelled
     implementation of the Project for 2004.   Instead, they waited
28   until the summer of 2005 to seek a permit from the State Water
     Board.

possibilities always exist and are too speculative to serve as a
sufficient basis to permit a project of this nature to go
forward.  Moreover, it is not certain this Project would insure
against the consequences of such a catastrophe.  Lastly,
defendants raise the specter of future state and federal
budgetary constraints which may affect the Project.  Such
speculation has no place in balancing the environmental injuries
in this case.

In sum, considering all the relevant interests, the court
finds that the balance of interests tips sharply in favor of
plaintiffs.

### 3.  **Merits of NEPA Claims**

Because plaintiffs made a strong showing of irreparable harm
and that the balance of interests tips decisively in plaintiffs'
favor, plaintiffs must only demonstrate "serious questions" as to
the merits of their NEPA claims.  Plaintiffs have done so on at
least two grounds.[8]

NEPA mandates that federal agencies prepare a detailed EIS
for all "major Federal actions significantly affecting the
quality of the human environment."  42 U.S.C. § 4332(2)(c).
An EIS must be prepared if "substantial questions are raised as
to whether a project . . . will have a significant impact on the

_____

[8]    To prevail on the motion, plaintiffs need only show a
likelihood of success on the merits/serious questions as to *one*
of their claims for relief.  Accordingly, the court does not
consider herein all of plaintiffs' claims nor all of the grounds
for plaintiffs' claims (for example, plaintiffs base their NEPA
claim for failure to prepare an EIS on five criteria for finding
"significance" sufficient to trigger the obligation to prepare an
EIS but the court only discusses two such criteria in this
order).  The court considers these two criteria because they
raise some overlapping issues.

6

environment." <u>Blue Mountains Biodiversity Project v. Blackwood</u>,
161 F.3d 1208, 1212 (9th Cir. 1998).  NEPA regulations provide
various factors for evaluating significance.  40 C.F.R.
§ 1508.27.  Pertinent to this order are the following factors,
either one of which can lead to a finding of "significance" (<u>see</u>
<u>Public Citizen v. Dept. of Transportation</u>, 316 F.3d 1002, 1023
(9th Cir. 2003)):

> (1)  The degree to which the effects on the quality of the
> human environment are likely to be highly
> controversial.  40 C.F.R. § 1508.27(b)(4).

> (2)  The degree to which the possible effects on the human
> environment are highly uncertain or involve unique or
> unknown risks.  <u>Id.</u> at § 1508.27(b)(5).

Plaintiffs need not show that the "significant effects *will in
fact occur*," because raising "substantial questions whether a
project may have a significant effect [on the environment] is
sufficient."  <u>Idaho Sporting Congress v. Thomas</u>, 137 F.3d 1146,
1150 (9th Cir. 1998).

As to the first factor, a "controversy" means that there is
a substantial (scientific) dispute about the size, nature, or
effect of the major federal action, rather than merely opposition
to it.  <u>Anderson v. Evans</u>, 371 F.3d 475, 489 (9th Cir. 2004).
Here, plaintiffs have raised substantial questions as to whether
such a controversy existed sufficient to trigger an EIS.

For example, plaintiffs have raised a serious question as to
whether plaintiffs' experts' comments and objections on the EA,
especially those of Nancy Erman and Dr. David Herbst, were
adequately addressed by the Service, particularly in light of Ms.

Erman's and Dr. Herbst's notable and well recognized expertise in the precise area of Sierra Nevada mountain invertebrate ecology. In light of that notable expertise, their opinions and concerns deserved close and extensive attention; the Service should have carefully and publicly weighed their opinions against other *comparable* expert opinions.  While the Service's *conclusions* are clear in the EA and FONSI, how and why the Service reached those conclusions is not at all clear.  That process of assessing and balancing the environmental impacts deserves far more transparent and careful analysis.  Thus, at this juncture, the court finds that substantial questions remain.  <u>See e.g.</u>, <u>Sierra Club v. United States Forest Service</u>, 843 F.2d 1190, 1193 (9th Cir. 1988) (holding that the Sierra Club's "affidavits and testimony of conservationists, biologists, and other experts who were highly critical of the EAs and disputed the Forest Service's conclusion that there would be no significant effects from logging because the sequoias could be protected and their regeneration enhanced," was "*precisely the type of 'controversial' action for which an EIS must be prepared.")* (Emphasis added.)

Secondly, plaintiffs have raised a serious question as to whether the possible effects on the human environment are so "highly uncertain or involve unique or unknown risks" that an EIS should have been prepared.

> The very purpose of NEPA's requirement that an EIS be prepared for all actions that may significantly affect the environment is to obviate the need for [s]peculation by insuring that available data is gathered and analyzed prior to implementation of the proposed action.

<u>Foundation for North American Wild Sheep v. United States Dept.</u>

1  Of Agriculture, 681 F.2d 1172, 1179 (9th Cir. 1982).  Here,

2  plaintiffs raise substantial questions regarding the presence of

3  potential rare and endemic macroinvertebrates in the subject

4  area.  There have been no studies and thus there is a complete

5  lack of data regarding this issue.  The parties dispute whether

6  such studies are mandated by industry standards, but nevertheless

7  the issue has been a central concern since the Project's

8  inception.  Plaintiffs have continued to raise these same

9  questions at every stage, as well as the failure of the Service

10 to adequately address these issues.  At this point, it appears to

11 the court that the solid scientific data regarding Ms. Erman's

12 declaration that there is a high probability that rare and

13 endemic species live in the Project area, is "precisely the

14 [type] of information . . . that is required *before* a decision

15 that *may* have a significant adverse impact on the environment is

16 made."  National Parks & Conservation Ass'n v. Babbitt, 241 F.3d

17 722, 733 (9th Cir. 2001) (emphasis in original and added).  As

18 the Ninth Circuit said in Babbitt, "[p]reparation of an EIS is

19 mandated where uncertainty may be resolved by further collection

20 of data, . . . or where the collection of data may prevent

21 speculation on potential . . . effects."  Id. at 732 (internal

22 quotations and citation omitted.)  Plaintiffs have raised a

23 substantial question on this exact issue.[9]

24        Therefore, for the foregoing reasons, the court GRANTS

25 plaintiffs' motion for a preliminary injunction:

26 _____

27        [9]    The court notes that on this issue, the Forest Service
   had two years to gather this information, between the earlier
28 2002 EA and the 2004 EA, yet for reasons unclear to the court, it
   choose not to do so.

1    IT IS HEREBY ORDERED that Defendants United States Forest

2 Service, and each of them, and their respective agents, partners,

3 employees, contractors, assignees, successors, representatives,

4 permittees and all persons acting under authority from, in

5 concert with, or for them in any capacity, including in a

6 volunteer capacity, are enjoined from allowing to be conducted or

7 conducting any component of the Silver King Creek Paiute

8 Cutthroat Trout Recovery Project, including specifically any

9 application of rotenone formulations and potassium permanganate

10 to Silver King Creek, its tributaries and backwaters, and

11 Tamarack Lake, in the Carson-Iceberg Wilderness in California.

12    In the court's discretion and in light of the nature of the

13 case, the court relieves plaintiffs of the obligation to file a

14 bond.  Fed. R. Civ. P. 65(c); See People ex rel. Van de Kamp v.

15 Tahoe Regional Plan, 766 F.2d 1319 (9th Cir. 1985) (bond not

16 required because of the "chilling effect" on public interest

17 litigants seeking to protect the environment).

18    IT IS SO ORDERED.

19 DATED:August 31, 2005

20

21                          /s/ Frank C. Damrell Jr.
                            FRANK C. DAMRELL JR.
22                          United States District Judge

23

24

25

26

27

28

10