UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

----oo0oo----

CALIFORNIANS FOR ALTERNATIVES
TO TOXICS, a non-profit
corporation; WILDERNESS WATCH,
a non-profit corporation,
LAUREL AMES, an individual and
ANN MCCAMPBELL, an individual,

        Plaintiffs,

   v.

JACK TROYER, in his official
capacity; USDA FOREST SERVICE;
GARY SCHIFF, in his official
capacity,

        Defendants.

NO. CIV. S-05-1633 FCD KJM

**AMENDED** MEMORANDUM AND ORDER[1]

----oo0oo----

     This matter is before the court on plaintiffs' motion for a preliminary injunction enjoining defendants "from allowing to be conducted or conducting any component of the Silver King Creek

---

[1] This amended memorandum and order makes minor modifications to the order filed on August 31, 2005.  That order is hereby VACATED and the instant order supercedes it in all respects.

1

Paiute Cutthroat Trout ["PCT"] Recovery Project [the "Project"],[2] including specifically any application of rotenone formulations and potassium permanganate to Silver King Creek, its tributaries and backwaters, and Tamarack Lake, in the Carson-Iceberg Wilderness in California."  ([Proposed] Order Granting Pls.' P.I. Mot., filed Aug. 26, 2005.)[3]  The court heard oral argument on the motion on August 30, 2005 and announced from the bench its decision to grant the motion.  By this order, the court memorializes its reasons for the decision, previously stated on the record at the hearing.[4]

To obtain a preliminary injunction, a party must show either: "(1) a combination of probable success on the merits and the possibility of irreparable injury, or (2) that serious questions are raised and the balance of hardships tips sharply in [its favor]."  Stuhlbarg Int'l Sales Co. v. John D. Brush & Co., Inc., 240 F.3d 832, 839-40 (9th Cir. 2001).  "These two formulations represent two points on a sliding scale in which the required degree of irreparable harm increases as the probability of success decreases."  Roe v. Anderson, 134 F.3d 1400, 1402 (9th

---

[2] The goal of the Project is to rid the waters, some eleven miles of creek and a nearby lake, of non-native rainbow trout, which have interbred with PCT and compete with it for food.  Once the rainbow trout are eliminated, part of the area would be restocked with genetically pure PCT.

[3] The court previously granted plaintiffs, on August 23, a temporary restraining order on the same terms.  The matter was set for a preliminary injunction hearing on an expedited schedule in light of time constraints and logistical issues regarding implementation of the Project.

[4] The underlying facts of this case are exhaustively discussed by the parties in their briefs, and they accordingly are not discussed herein.

1 Cir. 1998).  Under either formulation of the test, a plaintiff
2 must still demonstrate a significant threat of irreparable
3 injury.  Oakland Tribune, Inc. v. Chronicle Publishing Co., 762
4 F.2d 1374, 1376 (9th Cir. 1985).
5    Here, plaintiffs made a strong showing of irreparable harm
6 if the Project is not enjoined and that the balance of interests
7 tips decisively in their favor.  As such, to prevail on the
8 motion, plaintiffs were only required to raise "serious
9 questions" as to the merits of their NEPA claims (namely, that
10 the United States Department of Agriculture Forest Service (the
11 "Service") violated NEPA in failing to prepare an Environmental
12 Impact Statement ("EIS") and/or that the Service's Environmental
13 Assessment ("EA") was inadequate), which the court found they
14 did.  The court will address in turn below the bases for each of
15 these findings.

### 1. **Irreparable Harm**

17    There is no dispute that poisoning the waters with rotenone,
18 a highly toxic chemical lethal to acquatic organisms that obtain
19 oxygen from water, will kill macroinvertebrates and certain
20 species may never return to the impacted area.  (Erman Decl., ¶s
21 3, 29.)  While the parties dispute the relative ability of
22 macroinvertebrates to repopulate,[5] the lethal consequences are

---

[5] According to plaintiffs' experts data from past projects in other reaches of Silver King Creek show that even years after the poisoning, entire taxa were still missing from the stream (on average, between 30 to 40% of all macroinvertebrate taxa were still missing three years after the project).  (Erman Decl., ¶s 13-15, 24-28, 31.)  To the contrary, defendants' experts maintain the macroinvertebrate populations will recover quickly and to an "excellent" level as they have in past, similar projects.  (Moyle Decl., ¶s 10-16; Behke Decl., ¶s 11-15.)

3

certain.

Additionally, plaintiffs present evidence that the poisoning may harm certain "rare and endemic" macroinvertebrates present in the area. According to plaintiffs' macroinvertebrate expert, Nancy Erman, it is "highly probable" that such species exist in the area. While defendants' experts dispute this conclusion, there has not been any studies to confirm either parties' position. Nevertheless, equity favors plaintiffs because once the poisoning takes place, the eradication of such species, if present, is, again, swift and certain.

Finally, it is undisputed that the subject area is an unimpaired reference in that it has never been previously poisoned. Were the court to allow the poisoning to proceed immediately, that reference would be permanently eliminated. In that regard, as in others, the execution of the Project means the stark finality to life in an eleven mile stream in the treasured Sierra Nevada Mountains.

For these reasons, plaintiffs have demonstrated a strong likelihood of irreparable harm if the court does not enjoin the Project.

**2.   Balancing of Interests**

In plaintiffs' favor is evidence that macroinvertebrates, and possibly rare and endemic macroinvertebrates, will be killed by the poisoning and may never repopulate; additionally, the poisoning will eliminate the unimpaired reference. In defendants' favor, the PCT is a listed "threatened species" under the Endangered Species Act. According to the Service, in the absence of immediate implementation of the Project, the long term

4

survival of the PCT will be in some doubt.  (Somer Decl., ¶ 6, 12.)

However, the PCT Recovery Plan itself explicitly finds that the PCT has only a "moderate degree of threat."[6]  (Ex. FF at iii.)  Likewise, defendants did not produce any convincing evidence that absent implementation of the Project this year or even in the next few years, the PCT would be at risk of extinction.  Rather, there is undisputed evidence that the pure strain of PCT has existed in the Silver King Creek above Llewellyn Falls for at least eleven years without any negative impacts, thus providing additional protection for the survival of the species.[7]  Also, significantly, defendants did not argue in their joint petition to the California State Water Board that there was any urgency to act in 2005.[8]

---

[6] Defendants are incorrect that the Recovery Plan stated that the PCT is "highly vulnerable" to extinction.  Rather, the Plan stated that the PCT *would be* "highly vulnerable" *if* the pure, self-sustaining runs of PCT did not already exist in at least six other creek watersheds (*which it does*).

[7] From the EA, it also appears that PCT currently exists in the Corral Valley Creek and Coyote Valley Creek within the Silver King Creek Basin, and plaintiffs assert in waters outside the Basin.

[8] Indeed, it is worth noting that defendants have made in a series of choices which have delayed implementation of the Project.  First, they choose in 2002 to not conduct a full NEPA analysis; that decision resulted in litigation against the Service; ultimately, the Service settled the suit, promising to perform the requisite analysis.  However, two years passed until completion of the EA at issue here.  Upon seeking the necessary permits from state agencies, defendants again further delayed the matter; rather than provide information in response to the Lahonton Regional Board's inquiries, defendants cancelled implementation of the Project for 2004.  Instead, they appealed to the State Water Board asking it to review the Lahonton Board's actions and grant the permit; the State Board did not do so until July 6, 2005.

Defendants' reliance on the possibility of some catastrophic event, such as a forest fire or flood, which could destroy the existing PCT in its present habitats is unconvincing. Such possibilities always exist and are too speculative to serve as a sufficient basis to permit a project of this nature to go forward. Moreover, it is not certain this Project would insure against the consequences of such a catastrophe. Lastly, defendants raise the specter of future state and federal budgetary constraints which may affect the Project. Such speculation has no place in balancing the environmental injuries in this case.

In sum, considering all the relevant interests, the court finds that the balance of interests tips sharply in favor of plaintiffs.

### 3. **Merits of NEPA Claims**

Because plaintiffs made a strong showing of irreparable harm and that the balance of interests tips decisively in plaintiffs' favor, plaintiffs must only demonstrate "serious questions" as to the merits of their NEPA claims. Plaintiffs have done so on at least two grounds.[9]

NEPA mandates that federal agencies prepare a detailed EIS for all "major Federal actions significantly affecting the

---

[9] To prevail on the motion, plaintiffs need only show a likelihood of success on the merits/serious questions as to *one* of their claims for relief. Accordingly, the court does not consider herein all of plaintiffs' claims nor all of the grounds for plaintiffs' claims (for example, plaintiffs base their NEPA claim for failure to prepare an EIS on five criteria for finding "significance" sufficient to trigger the obligation to prepare an EIS but the court only discusses two such criteria in this order). The court considers these two criteria because they raise some overlapping issues.

6

quality of the human environment." 42 U.S.C. § 4332(2)(c). An EIS must be prepared if "substantial questions are raised as to whether a project . . . will have a significant impact on the environment." Blue Mountains Biodiversity Project v. Blackwood, 161 F.3d 1208, 1212 (9th Cir. 1998). NEPA regulations provide various factors for evaluating significance. 40 C.F.R. § 1508.27. Pertinent to this order are the following factors, either one of which can lead to a finding of "significance" (see Public Citizen v. Dept. of Transportation, 316 F.3d 1002, 1023 (9th Cir. 2003)):

    (1)   The degree to which the effects on the quality of the human environment are likely to be highly controversial. 40 C.F.R. § 1508.27(b)(4).

    (2)   The degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks. Id. at § 1508.27(b)(5).

Plaintiffs need not show that the "significant effects *will in fact occur*," because raising "substantial questions whether a project may have a significant effect [on the environment] is sufficient." Idaho Sporting Congress v. Thomas, 137 F.3d 1146, 1150 (9th Cir. 1998).

    As to the first factor, a "controversy" means that there is a substantial (scientific) dispute about the size, nature, or effect of the major federal action, rather than merely opposition to it. Anderson v. Evans, 371 F.3d 475, 489 (9th Cir. 2004). Here, plaintiffs have raised substantial questions as to whether such a controversy existed sufficient to trigger an EIS.

7

For example, plaintiffs have raised a serious question as to whether plaintiffs' experts' comments and objections on the EA, especially those of Nancy Erman and Dr. David Herbst, were adequately addressed by the Service, particularly in light of Ms. Erman's and Dr. Herbst's notable and well recognized expertise in the precise area of Sierra Nevada mountain invertebrate ecology. In light of that notable expertise, their opinions and concerns deserved close and extensive attention; the Service should have carefully and publicly weighed their opinions against other *comparable* expert opinions. While the Service's *conclusions* are clear in the EA and FONSI, how and why the Service reached those conclusions is not at all clear. That process of assessing and balancing the environmental impacts deserves far more transparent and careful analysis. Thus, at this juncture, the court finds that substantial questions remain. See e.g., Sierra Club v. United States Forest Service, 843 F.2d 1190, 1193 (9th Cir. 1988) (holding that the Sierra Club's "affidavits and testimony of conservationists, biologists, and other experts who were highly critical of the EAs and disputed the Forest Service's conclusion that there would be no significant effects from logging because the sequoias could be protected and their regeneration enhanced," was "*precisely the type of 'controversial' action for which an EIS must be prepared.*") (Emphasis added.)

Secondly, plaintiffs have raised a serious question as to whether the possible effects on the human environment are so "highly uncertain or involve unique or unknown risks" that an EIS should have been prepared.

8

> The very purpose of NEPA's requirement that an EIS be prepared for all actions that may significantly affect the environment is to obviate the need for [s]peculation by insuring that available data is gathered and analyzed prior to implementation of the proposed action.

Foundation for North American Wild Sheep v. United States Dept. Of Agriculture, 681 F.2d 1172, 1179 (9th Cir. 1982). Here, plaintiffs raise substantial questions regarding the presence of potential rare and endemic macroinvertebrates in the subject area. There have been no studies and thus there is a complete lack of data regarding this issue. The parties dispute whether such studies are mandated by industry standards, but nevertheless the issue has been a central concern since the Project's inception. Plaintiffs have continued to raise these same questions at every stage, as well as the failure of the Service to adequately address these issues. At this point, it appears to the court that the solid scientific data regarding Ms. Erman's declaration that there is a high probability that rare and endemic species live in the Project area, is "precisely the [type] of information . . . that is required *before* a decision that *may* have a significant adverse impact on the environment is made." National Parks & Conservation Ass'n v. Babbitt, 241 F.3d 722, 733 (9th Cir. 2001) (emphasis in original and added). As the Ninth Circuit said in Babbitt, "[p]reparation of an EIS is mandated where uncertainty may be resolved by further collection of data, . . . or where the collection of data may prevent speculation on potential . . . effects." Id. at 732 (internal quotations and citation omitted.)

9

Therefore, for the foregoing reasons, the court GRANTS plaintiffs' motion for a preliminary injunction:

IT IS HEREBY ORDERED that Defendants United States Forest Service, and each of them, and their respective agents, partners, employees, contractors, assignees, successors, representatives, permittees and all persons acting under authority from, in concert with, or for them in any capacity, including in a volunteer capacity, are enjoined from allowing to be conducted or conducting any component of the Silver King Creek Paiute Cutthroat Trout Recovery Project, including specifically any application of rotenone formulations and potassium permanganate to Silver King Creek, its tributaries and backwaters, and Tamarack Lake, in the Carson-Iceberg Wilderness in California.

In the court's discretion and in light of the nature of the case, the court relieves plaintiffs of the obligation to file a bond. Fed. R. Civ. P. 65(c); See People ex rel. Van de Kamp v. Tahoe Regional Plan, 766 F.2d 1319 (9th Cir. 1985) (bond not required because of the "chilling effect" on public interest litigants seeking to protect the environment).

IT IS SO ORDERED.

DATED: September 1, 2005

/s/ Frank C. Damrell Jr.
FRANK C. DAMRELL, Jr.
UNITED STATES DISTRICT JUDGE